BLECHER COLLINS PEPPERMAN & JOYE, P.C.
Maxwell M. Blecher (State Bar No. 26202)
 mblecher@blechercollins.com
Howard K. Alperin (State Bar No 158809)
 halperin@blechercollins.com
Jordan L. Ludwig (State Bar No. 277952)
 jludwig@blechercollins.com
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

Attorneys for Plaintiff
Starlight Cinemas

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| STARLIGHT CINEMAS, | CASE NO.: 2:14-cv-05463-R-AS |
| Plaintiff, | **STARLIGHT CINEMAS'** |
| v. | **OPPOSITION TO REGAL** |
| | **ENTERTAINMENT GROUP'S** |
| REGAL ENTERTAINMENT GROUP | **MOTION TO DISMISS** |
| and DOES 2 through 50, | |
| Defendants. | Hon. Manuel L. Real |
| | Hearing Date: October 20, 2014 |
| | Time: 10:00 a.m. |
| | Courtroom: 8 |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................... 2

III. LEGAL ARGUMENT ............................................................................... 4

    A. Starlight sufficiently alleges a plausible claim for relief under the Cartwright Act that rises above the speculative level ............................. 4

        1. Starlight has alleged the "agreement" element of its Cartwright Act claim by alleging that Regal obtained clearances from film distributors for first-run movies ................. 6

        2. Starlight states a harm to competition in Corona because it has alleged a network of clearances that have virtually eliminated retail competition for first-run movies ........................ 9

            a. The clearances that Starlight alleges are not categorically lawful ................................................................. 9

            b. Starlight has alleged a relevant product and geographic market ............................................................... 13

            c. Starlight has alleged that Regal's network of clearances harm competition ............................................. 16

    B. Starlight alleges a violation of California's Unfair Competition Law ........................................................................................................ 18

    C. Starlight alleges a claim for intentional interference with prospective economic advantage ........................................................... 19

    D. In the event that the Court finds Starlight's complaint deficient, Starlight should be granted leave to amend its complaint .................... 20

IV. CONCLUSION ....................................................................................... 21

i

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page(s)</u>

3
### <u>Cases</u>

4
*Amarel v. Connell*,
   202 Cal. App. 3d 137 (1988) .................................................................5

5
*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ................................................................8

6
*Aryeh v. Canon Bus. Solutions, Inc.*,
   55 Cal. 4th 1185 (2013) ....................................................................18

7
*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................4

8
*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................4, 7

9
*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999) ...........................................................15

10
*Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*,
   No. 10-02175-DDP, 2010 WL 4366849 (C.D. Cal. Sept. 23, 2010) ........12, 17, 20

11
*Brown Shoe Co. v. U.S.*,
   370 U.S. 294 (1962) .........................................................................15

12
*Cahill v. Liberty Mut. Ins. Co.*,
   80 F.3d 336 (9th Cir. 1996) .............................................................4, 5

13
*Cellular Plus, Inc. v. Superior Court*,
   14 Cal. App. 4th 1224 (1993) ...........................................................5, 7

14
*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) .....................................................................19

15
*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
   611 F.3d 495 (9th Cir. 2010) .............................................................6

16
*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*,
   4 Cal. 3d 842 (1971) .......................................................................13

17
*Countrywide Fin. Corp. v. Bundy*,
   187 Cal. App. 4th 234 (2010) ...........................................................19

18
*Davis v. HSBC Bank Nev., N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ............................................................5

19
*DCD Programs, Ltd. v. Leighton*,
   833 F.2d 183 (9th Cir. 1987) ............................................................20

20
*E. Food Servs. Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*,
   357 F.3d 1 (1st Cir. 2004) ................................................................17

21
*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) .........................................................14, 15

22
*Evergreen Partnering Group., Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013) ..............................................................12

23
*Exxon Corp. v. Superior Court*,
   51 Cal. App. 4th 1672 (1997) ...............................................11, 13, 16, 17

24
*Fisherman's Wharf Bay Cruise Corp. v. Superior Court*,
   114 Cal. App. 4th 309 (2003) ..........................................................9, 13, 18

25
*Flagship Theatres of Palm Desert, LLC v. Century Theaters, Inc.*,
   198 Cal. App. 4th 1366 (2011) .........................................................4, 10

26
*G.H.I.I. v. MTS, Inc.*,
   147 Cal. App. 3d 256 (1983) ............................................................8, 9

27
*Gulf States Reorganization Group, Inc. v. Nucor Corp.*,
   466 F.3d 961 (11th Cir. 2006) ..........................................................18

28
*Hosp. Building Co. v. Trustees of Rex Hosp.*,
   425 U.S. 738 (1976) ...........................................................................5

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   846 F. Supp. 2d 1335 (N.D. Ga. 2012) .................................................................5
*J.D. Fields & Co. v. Nucor-Yamato Steel*,
   976 F. Supp. 2d 1051 (E.D. Ark. 2013) ...............................................................5
*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ...............................................................................7
*Kolling v. Dow Jones & Co.*,
   137 Cal. App. 3d 709 (1982) ................................................................................13
*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ........................................................................................19
*Marin County Bd. of Realtors, Inc. v. Palsson*,
   16 Cal. 3d 920 (1976) .............................................................................16, 17, 18
*Menard v. CSX Transp., Inc.*,
   698 F.3d 40 (1st Cir. 2012) ....................................................................................6
*Morongo Band of Mission Indians v. Rose*,
   893 F.2d 1074 (9th Cir. 1987) .............................................................................20
*Newcal Indus., Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) .......................................................................13, 14
*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
   604 F.3d 1291 (11th Cir. 2010) ...........................................................................18
*People v. Santa Clara Val. Bowling Proprietors' Ass'n*,
   238 Cal. App. 2d 225 (1965) ...............................................................................17
*Ralph C. Wilson Indus., Inc. v. Am. Broadcasting Cos.*,
   598 F. Supp. 694 (N.D. Cal. 1984) ......................................................................11
*Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC*,
   317 F. Supp. 2d 301 (S.D.N.Y. 2003) .................................................................12
*Reading Int'l, Inc. v. Oaktree Capital. Mgmt. LLC*,
   No. 03-1895, 2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) ......................................11
*RealPage, Inc. v. Yardi Systems, Inc.*,
   852 F. Supp. 2d 1215 (C.D. Cal. 2012) ........................................................15, 16
*Redwood Theaters, Inc. v. Festival Enterprises., Inc.*,
   200 Cal. App. 3d 687 (1988) .....................................................................10, 11, 13
*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ...............................................................................8
*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) .............................................................................15
*Theee Movies of Tarzana v. Pac. Theatres, Inc.*,
   828 F.2d 1395 (9th Cir. 1987) .......................................................................11, 12
*U.S. v. Paramount Pictures*,
   334 U.S. 131 (1948) ..............................................................................................10
*W. Boylston Cinema Corp. v. Paramount Pictures Corp.*,
   No. Civ. A 98-00252, 2000 WL 1468513 (Mass. Super. Sept. 21 2000) ............11
*Watson Carpet & Floor Covering Inc. v. Mohawk Indus., Inc.*,
   648 F.3d 452 (6th Cir. 2011) .................................................................................8
*Yagoozon, Inc. v. Fun Express, LLC*,
   No. 13-595ML, 2014 WL 1922793 (D.R.I. Feb. 10, 2014) ...................................6

**Statutes**
15 U.S.C. § 1 ...............................................................................................................4
Cal. Bus. & Prof. Code
   § 16720(a) ...............................................................................................................4
   § 16726......................................................................................................................4
   § 16756......................................................................................................................5
   § 17200....................................................................................................................18

iii

**<u>Rules</u>**

Fed. R. Civ. P.
    Rule 8(a)(2)........................................................................................4, 5
    Rule 9 ....................................................................................................7
    Rule 12(b)(6)..............................................................................passim
    Rule 15(a)(2)........................................................................................20

1   <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2      Plaintiff Starlight Cinemas ("Starlight") respectfully submits this

3   Memorandum in Opposition to Regal Entertainment Group's ("Regal") Motion to

4   Dismiss ("Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6):

5   **I.      INTRODUCTION**

6      This is an antitrust action by Starlight, the owner of a few independent movie

7   theaters in California, against Regal, the largest and most geographically diverse

8   theater circuit in the United States.  Regal maintains approximately 578 theaters

9   constituting 7,631 screens throughout the nation.  Starlight has six.  Both have

10  theaters in Corona, California.

11     This lawsuit is about Regal entering into exclusive "clearance" agreements

12  with film distributors.  A "clearance" is a species of an exclusive-dealing agreement

13  between a favored film exhibitor and a film distributor.  Under the terms of a

14  clearance, the distributor agrees that it will not license a film to play at other theaters

15  within a geographic zone.  Stated simply, only one theater can show a certain movie.

16  Regal has entered into such clearances with film distributors, and these clearances

17  prohibit Starlight from playing first-run films that Regal is showing in Corona.

18     Regal obtains these clearances by expressly or impliedly leveraging the size of

19  its circuit—particularly its theaters in noncompetitive markets—in order to obtain

20  favored access to film licenses for first-run films in competitive markets, such as

21  Corona.  A powerful exhibitor can coerce these favorable film licenses from

22  distributors based on the theater circuit's ability to deliver many screens on which

23  the distributor's film will be played or by threatening to withhold such screens.  For

24  example, in a noncompetitive area—that is, a location with only one theater—Regal

25  could devote multiple screens to a popular first-run movie in exchange for

26  exclusivity in a geographic area where there are multiple theaters.  If the distributor

27  is resistant, Regal could threaten to show the film on one or no screens.  Even if such

28

1    an action was unspoken, distributors know a dominant exhibitor could retaliate in
2    this manner.

3    　　　These tactics are antithetical to fair and free competition and are illegal under
4    California law, which requires that first-run theatrical film licensing decisions be
5    made solely on a theater-by-theater and film-by-film basis.  This affords a fair
6    opportunity for small, independent theater operators, such as Starlight, to compete on
7    a level playing field with large theater circuits such as Regal.  In the absence of such
8    a rule, small, independent competitors could never obtain fair access to films, and the
9    market would be even further compressed to a pure oligopoly with a few large
10   competitors dominating the entire market.

11   　　　Contrary to Regal's formulaic use of the cliché that, "rather than compete in
12   the marketplace, the plaintiff is trying to compete in the court," Starlight is left with
13   no alternative but to seek judicial intervention to cure a blatant violation of the
14   Cartwright Act.  If Regal was truly serious about competing on the merits, it would
15   have done so rather than locking up the Corona market with exclusive clearances.  If
16   it offered a superior theater, consumers would flock to it and Starlight would quickly
17   suffer the competitive consequences.  But instead, Regal is trying to bully Starlight
18   from the market by foreclosing its essential supply—popular, first-run movies.
19   Starlight's complaint sufficiently alleges that Regal engaged in unlawful and
20   anticompetitive behavior that includes antitrust violations of California's Cartwright
21   Act, California's Unfair Competition Law ("UCL"), and the tort of Intentional
22   Interference with Prospective Economic Advantage.   For the reasons below, Regal's
23   Motion should be denied in its entirety.

24   **II.    FACTUAL BACKGROUND**

25   　　　Starlight operates the Dos Lagos Theater, a 15-screen movie theater in Corona,
26   California.  (Compl. ¶¶ 6, 19.)  The Dos Lagos offers state-of-the-art technical
27   presentation, a luxurious appearance, and other upscale amenities that consumers
28   desire in attending a movie.  (*Id.* ¶ 19.)  Regal operates the competing Regal Corona

Crossings, which is an upscale 18-screen theater also in Corona.  (*Id.* ¶ 18.)  Regal is the largest and most geographically diverse theater circuit in the United States.  (*Id.* ¶ 7.)  It controls approximately 575 theaters constituting approximately 7,631 screens.  (*Id.*)  The Dos Lagos and the Corona Crossings compete with one another in the Corona market.  (*Id.* ¶ 6.)  Both Starlight and Regal are considered "exhibitors" in the film industry.  (*Id.* ¶ 9.)

Exhibitors such as Starlight and Regal license films from a small number of distributors such as Sony and Universal.  (*Id.* ¶ 10.)  The most important of these films are first-run films.  (*Id.* ¶ 12.)  A film is in its "first run" in the weeks following its release date—before it is ultimately released on DVD, pay-per view television, or more modern streaming services such as iTunes.  (*Id.*)  A film's first run is ordinarily its *only* theatrical run, and if an exhibitor cannot obtain rights to show the film during this time, it will effectively never have access to it, or will only have access to it when no one wants to see it anymore.  (*Id.*)  Given the limited life span of first-run films, most distributors have more recently adopted a "wide release" strategy, meaning that the distributors try to ensure their films are on as many screens and in as many theaters as possible in order to maximize revenue.  (*Id.* ¶ 16.)  The amount of screens—referred to in the industry as "screen count"—is an important metric for evaluating a film's success.  (*Id.*)  Regal, which controls 7,631 screens, can make a massive difference in a film's screen count.  (*Id.* ¶ 17.)  This holds particularly true in monopoly zones where Regal controls every screen and the distributor has no alternative.  (*Id.*)

In the last four years, Regal began demanding and receiving clearances for its Corona Crossing Theater from every distributor for the vast majority of film-run films.  (*Id.* ¶ 22.)  Since then, Starlight has repeatedly attempted to obtain licenses from these distributors to no avail.  (*Id.* ¶ 23.)  This is despite the fact that Starlight is confident it has been offering the distributors substantially more advantageous terms than those Regal offers.  (*Id.*)  The distributors agree to these exclusive licenses,

1 which are against their best interests, under fear that Regal will retaliate while

2 Starlight cannot do so in any meaningful way.  (*Id.* ¶ 24.)  On the other hand,

3 distributors do not grant Regal exclusivity in zones where they compete with other

4 powerful exhibitors that also have large theater circuits.  (*Id.*)

5       Starlight filed this action in the Los Angeles Superior Court on June 17, 2014

6 to vitiate Regal's anticompetitive conduct.  About one month later, Regal removed

7 the action to this Court and subsequently filed its Motion.

8 **III.   LEGAL ARGUMENT**

9       To state a valid claim for relief, the Federal Rules of Civil Procedure require

10 only a "short and plain statement of the claim showing that the pleader is entitled to

11 relief."  Fed. R. Civ. P. 8(a)(2).  Rule 8 does not require detailed factual allegations.

12 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  District courts should allow a

13 complaint to proceed even if the plaintiff is unlikely to ultimately prevail.  *Id.* at 556.

14 The Court must accept all factual allegations of the complaint as true and must

15 indulge ever reasonable inference in the plaintiff's favor.  *Cahill v. Liberty Mut. Ins.*

16 *Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  Rule 8 does not impose a "probability

17 requirement," it only requires that the plaintiff offer "more than a sheer possibility

18 that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

19       **A.     Starlight sufficiently alleges a plausible claim for relief under the**

20             **Cartwright Act that rises above the speculative level**

21       California's Cartwright Act states that "A trust is a combination of capital,

22 skill or acts by two or more persons . . . [t]o create or carry out restrictions in trade or

23 commerce."  Cal. Bus. & Prof. Code § 16720(a).  And "[e]xcept as provided in this

24 chapter, every trust is unlawful, against public policy and void."  Cal. Bus. & Prof.

25 Code § 16726.  These sections of the Cartwright Act are "analogous to the catchall

26 language of section 1 of the Sherman Act (15 U.S.C. § 1)."  *Flagship Theatres of*

27 *Palm Desert, LLC v. Century Theaters, Inc.*, 198 Cal. App. 4th 1366, 1374 (2011).

28 There are three elements to state a claim under the Cartwright Act: (1) the formation

1  and operation of a conspiracy; (2) a wrongful act or acts done pursuant to the

2  conspiracy; and (3) damage resulting from those wrongful acts.  *Cellular Plus, Inc. v.*

3  *Superior Court*, 14 Cal. App. 4th 1224, 1236 (1993).

4      The Cartwright Act *specifically provides* for a liberal construction in

5  pleadings, stating "In any indictment, information or complaint for any offense

6  named in this chapter, it is sufficient to state the purpose or effects of the trust or

7  combination, and that the accused is a member of, acted with, or in pursuance of it,

8  or aided or assisted in carrying out its purposes, without giving its name or

9  description, or how, when and where it was created."  Cal. Bus. & Prof. Code §

10  16756.  While this statute does not absolve Starlight of its responsibility to plead a

11  conspiracy, section 16756's codification is state substantive law and evidences a

12  clear policy decision from the California legislature to promote enforcement of the

13  Cartwright Act.  Because this is a diversity case, California state law governs, and

14  the Cartwright Act should be interpreted under California Law.  *Cahill*, 80 F.3d at

15  338; *see also Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012)

16  ("As we sit in diversity, California law governs our analysis of the state law

17  claims.").  Under California law, the Court's interpretation of the Cartwright Act

18  should be "liberal."  *Amarel v. Connell*, 202 Cal. App. 3d 137, 140-41 (1988).

19      Moreover, although *Twombly* and its progeny may have elevated the pleading

20  standard under Rule 8, nothing in *Twombly* purports to overturn the long-settled

21  principle that "in antitrust cases, where the proof  is largely in the hands of the

22  alleged conspirators . . . dismissals prior to giving the plaintiff ample opportunity for

23  discovery should be granted very sparingly."  *Hosp. Building Co. v. Trustees of Rex*

24  *Hosp.*, 425 U.S. 738, 746-47 (1976) (internal quotation marks omitted).  In fact, even

25  after *Twombly* and *Iqbal*, courts continue to recognize this principle in both the

26  antitrust context and outside it.  *E.g.*, *J.D. Fields & Co. v. Nucor-Yamato Steel*, 976

27  F. Supp. 2d 1051, 1059 (E.D. Ark. 2013) (citing *Hospital Building Co.*); *In re*

28  *Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1363 (N.D. Ga.

1   2012) (same); *Yagoozon, Inc. v. Fun Express, LLC*, No. 13-595ML, 2014 WL

2   1922793, at *1 (D.R.I. Feb. 10, 2014) (same); *see also Menard v. CSX Transp., Inc.*,

3   698 F.3d 40, 45 (1st Cir. 2012) ("Nevertheless, 'some latitude' may be appropriate

4   where a plausible claim may be indicated 'based on what is known,' at least where,

5   as here, 'some of the information needed may be in the control of the defendants.'").

6       1.    **Starlight has alleged the "agreement" element of its**

7             **Cartwright Act claim by alleging that Regal obtained**

8             **clearances from film distributors for first-run movies**

9       Regal's first argument is that Starlight has not alleged the "agreement"

10  element of the Cartwright Act claim. (Dkt. 21 at 5.) According to Regal, Starlight

11  has not "allege[d] facts making it plausible that Regal did, in fact, enter into

12  agreements with film distributors preventing the distributors from licensing" to

13  Starlight. (*Id.*) Regal is wrong. First, Starlight alleges that Regal demands, and film

14  distributors agree to, exclusive clearances for first-run films in Regal's favor.

15  (Compl. ¶ 24.) This is so despite the fact that it is in the best interests of distributors

16  to play their first-run films on as many screens as possible. (*Id.* ¶ 16.) Starlight also

17  alleges that it has tried many times to obtain first-run film licenses from

18  distributors—offering extremely favorable terms—but it cannot obtain any despite

19  offering *substantially better terms* than Regal does. (*Id.* ¶ 23.) If the film

20  distributors' goal was to place their films on as many screens as possible to

21  maximize revenue—a patently reasonable goal—why else, other than an exclusivity

22  arrangement, would distributors refuse to license to Starlight and gain access to these

23  additional screens? It is demonstrably plausible that Regal has obtained exclusivity

24  in the Corona market and that is why distributors will not license to Starlight or even

25  listen to bids in some instances. *See Coal. for ICANN Transparency, Inc. v.*

26  *VeriSign, Inc.*, 611 F.3d 495, 503 (9th Cir. 2010) (noting that the presence or absence

27  of competitive bidding should be considered in evaluating exclusive arrangements

28  under the antitrust laws). To conclude otherwise would require the Court to actively

1  infer *against* Starlight and in Regal's favor.  That is not allowed in the office of a

2  motion to dismiss.

3  　　　　But Regal wants more: it wants the "who, what, where, and when."  (Dkt. 21

4  at 5.)  That level of specificity is not required.  *Twombly*, 550 U.S. at 569 n.14

5  ("[W]e do not apply any 'heightened' pleading standard, nor do we seek to broaden

6  the scope of Federal Rule of Civil Procedure 9.").  In support of this heightened

7  pleading standard, which is no different from Rule 9(b), Regal cites a sentence

8  fragment from *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

9  What Regal omits from *Kendall*, however, is the crucial first part of the sentence,

10 which states, "*[e]ven after the depositions taken*" the complaint failed to plead those

11 allegations.  *Id.* (emphasis added).  If the Court intends to hold Starlight to such a

12 standard, Starlight respectfully requests leave of the Court to conduct the same

13 discovery as occurred in *Kendall*.  518 F.3d at 1046 ("The district court then allowed

14 appellants to conduct discovery so they would have the facts they needed to plead an

15 antitrust violation in their amended complaint.").

16 　　　　In any event, Starlight has sufficiently alleged enough specific facts to survive

17 even under Regal's heightened pleading standard.  The Complaint states that there

18 are only a "small number of distributors" (Compl. ¶ 10), and all of these distributors

19 will not license the vast majority of first-run films to Starlight because they entered

20 into clearances with Regal, (*id.* ¶¶ 23, 24).  That is the "who" and the "what."

21 Further, Starlight also alleges that "Beginning within four (4) years prior to this

22 complaint, Regal began receiving exclusive licenses for the vast majority of first run

23 films in the relevant market," which is alleged to be Corona.  (*Id.* ¶ 22.)  That is the

24 "when" and the "where."  This is more than enough to state a claim under the

25 Cartwright Act.  *See Cellular Plus*, 14 Cal. App. 4th at 1237-38 (discussing

26 "specific" factual allegations that stated a claim).

27 　　　　Regal also asserts that the exclusivity arrangements were based on "unilateral

28 business decision[s]" (Dkt. 21 at 6), and that the "distributors could have rejected

7

1   Starlight's offers for any number of independent business reasons" (*id.* at 8).  The

2   Ninth Circuit, however, has stated that "[i]f there are two alternative explanations,

3   one advanced by defendant and the other advanced by plaintiff, both of which are

4   plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."

5   *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Anderson News, L.L.C.*

6   *v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two

7   plausible inferences that may be drawn from factual allegations is not a choice to be

8   made by the court on a Rule 12(b)(6) motion."); *Watson Carpet & Floor Covering*

9   *Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Often, defendants'

10  conduct has several plausible explanations.  Ferreting out the most likely reason for

11  the defendants' actions is not appropriate at the pleadings stage.").  Such is the case

12  here.  While it may be that Regal can ultimately prove that *every* distributor just

13  happened to refuse to license first-run films to Starlight based on their own unilateral

14  business decisions, it is an eminently plausible explanation that Regal demanded

15  exclusivity from the distributors.  The Court must, therefore, accept Starlight's

16  version of the events at this juncture.

17       Finally, Regal also attacks Starlight's allegations of economic coercion as

18  inadequate.  Under California law, "[i]t is also established . . . that a necessary

19  'conspiracy' or 'combination' cognizable as an antitrust action is formed where a

20  trader uses coercive tactics to impose restraints upon otherwise uncooperative

21  businesses.  *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 268 (1983).  Regal refers to

22  the Court of Appeal's finding in *G.H.I.I.* that there was "no specific allegations of

23  coercion" where the plaintiff alleged that the respondents convinced "distributors to

24  grant them price discounts and other beneficial terms" but there was a "lack of any

25  averment of coercion or a combination."  *Id.* at 269.  But unlike the plaintiff in

26  *G.H.I.I.*, Starlight *has* averred a combination and coercion in more detail.  The

27  complaint states, "Regal has used the immense buying power of its theater circuit

28  arising from the large monopoly of its theaters and screens in numerous markets in

1  the United States, including many monopoly markets where it operates the only

2  theater, to combine with and coerce film distributors to deprive Starlight . . . of fair

3  competitive access to films." (Compl. ¶ 1.)  Under California law interpreting the

4  Cartwright Act, "Courts have implied an agreement to exclusively deal whenever a

5  seller has used any coercive method that causes buyers to purchase its products

6  exclusively." *Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal.

7  App. 4th 309, 338 (2003)  These allegations are enhanced by Starlight's other

8  allegations that the traditional rationale for clearances has dissipated in the past few

9  years, and that distributors now shoot for a "wide-release" strategy where they have

10  their films shown on as many screens as possible. (*Id.*¶ 16.)  In other words, the

11  distributors are acting contrary to their best interests.  Starlight's allegations thus

12  "amply and clearly plead[] . . . the cause of action for violation of the Cartwright

13  Act." *G.H.I.I.*, 147 Cal. App. 3d at 269.

14          2. **Starlight states a harm to competition in Corona because it**

15          **has alleged a network of clearances that have virtually**

16          **eliminated retail competition for first-run movies**

17        Regal's second argument is that Starlight failed to allege a harm to

18  competition.  This argument is multipronged.  Regal contends that (1) the clearances

19  that Starlight alleges are automatically lawful; (2) Starlight has failed to allege a

20  relevant market; and (3) Starlight has failed to allege harm to competition in a

21  relevant market.  All three of these arguments are easily refuted.

22          a. **The clearances that Starlight alleges are not**

23          **categorically lawful**

24        Without explicitly stating it, Regal appears to first argue that clearances are,

25  for all intents and purposes, categorically lawful absent "extraordinary

26  circumstances." (Dkt. 21 at 9.)  At the outset, Regal argues that clearances are

27  evaluated under the antitrust "rule of reason" rather than the "per se" rule. (*Id.*)  It

28  must be noted, however, that recent California case law has pointed out that "There

1  are no published California cases evaluating the legality of clearances under the

2  Cartwright Act." *Flagship Theatres*, 198 Cal. App. 4th at 1375.  Consequently, the

3  Court should not automatically accept that the rule of reason applies.  But even

4  assuming the restraint is analyzed under the rule of reason, controlling California

5  case law demonstrates that, in spite of federal precedent, clearances raise serious

6  issues under the Cartwright Act.[1]

7          Under the rule of reason, Starlight must allege and ultimately prove that the

8  restraint's "anticompetitive effects outweigh its procompetitive effects."  *Id.* at 1374.

9  The seminal California case on evaluating exclusive-dealing agreements in the film

10 industry is *Redwood Theaters, Inc. v. Festival Enterprises., Inc.*, 200 Cal. App. 3d

11 687, 707 (1988), a case conspicuously missing from Regal's comprehensive motion.

12 There, in a similar (if not identical) context, the Court of Appeal wrote,

13              Exclusive dealing agreements involving a dominant firm in

14              an industry have long been subject to antitrust scrutiny.

15              But where competitive survival depends on gaining access

16              to a unique product, these agreements may present serious

17              antitrust questions in any well consolidated industry even if

18              it is dominated by no single firm.  This is the situation of

19              the motion picture industry where six major companies

20              distribute the bulk of the most remunerative first-run films.

21 *Redwood Theaters*, 200 Cal. App. 3d at 707; *see also U.S. v. Paramount Pictures*,

22 334 U.S. 131, 148 (1948) ("Clearances have been used along with price fixing to

23 suppress competition with the theaters of the exhibitor-defendants and with other

24 favored exhibitors.").  Put another way, cutting off access to first-run films

25 jeopardizes the survival of the competitor who cannot get these films.  Subsequent

26

27

28      [1] Starlight reserves the right to seek per se invalidation of the restraint of trade later in the litigation, but because it has pleaded more than enough facts to support rule of reason condemnation, it addresses only that far more stringent standard here.

1   California courts have affirmed the notion that the film industry—particularly when

2   it comes to first-run films—presents unique circumstances that distinguish it from

3   run-of-the-mill antitrust cases.  *E.g.*, *Exxon Corp. v. Superior Court*, 51 Cal. App.

4   4th 1672, 1684 (1997) ("However, on its facts, *Redwood Theatres* differs from this

5   case in that first run films are a unique product.").  The court in *Redwood Theaters*

6   further stressed this point by again noting that "if a motion picture exhibitor lacks

7   access to a substantial share of popular first-run films, he may be placed at a grave

8   competitive disadvantage against a competitor who has locked-in access to these

9   films through exclusive-dealing agreements.  The alleged agreements with Warner

10  Bros. and Paramount Pictures plainly present this issue."  200 Cal. App. 3d at 707.

11  And that is *precisely* what Starlight alleges.  (Compl. ¶¶ 22-26.)  But unlike in

12  *Redwood Theaters*, where agreements with Warner Bros. and Paramount Pictures got

13  the plaintiff past *summary judgment*, Starlight has alleged that it cannot obtain access

14  to the vast majority of first-run films from *all of the* distributors.  (*Id.*)  To say that

15  this allegation cannot even get Starlight past a motion to dismiss is irreconcilable

16  with the applicable California law.

17        Rather than acknowledge and confront this law, Regal cites primarily to

18  federal cases decided under the Sherman Act.  But even there it misses the mark.

19  *Every single case* that Regal cites supposedly standing for the proposition that

20  clearances are de facto reasonable except in "extraordinary circumstances" was

21  decided on summary judgment.  *Theee Movies of Tarzana v. Pac. Theatres, Inc.*, 828

22  F.2d 1395, 1401 (9th Cir. 1987) (affirming grant of summary judgment); *Reading*

23  *Int'l, Inc. v. Oaktree Capital. Mgmt. LLC*, No. 03-1895, 2007 WL 39301, at *19

24  (S.D.N.Y. Jan. 8, 2007) (granting summary judgment); *Ralph C. Wilson Indus., Inc.*

25  *v. Am. Broadcasting Cos.*, 598 F. Supp. 694, 710 (N.D. Cal. 1984) (granting

26  summary judgment); *W. Boylston Cinema Corp. v. Paramount Pictures Corp.*, No.

27  Civ. A. 98-00252, 2000 WL 1468513, at *20 (Mass. Super. Sept. 21, 2000) (granting

28  summary judgment).  This exact tactic has been rejected in the past in the context of

1  clearances: "Indeed, most of the cases defendants have cited dismissing claims

2  challenging unlawful clearances . . . have been decided at summary judgment or after

3  trial, *upon a finding that the clearances in question did not in fact present an*

4  *unlawful restraint of trade.*"  *Reading Int'l, Inc. v. Oaktree Capital Mgmt.*, LLC, 317

5  F. Supp. 2d 301, 321-22 (S.D.N.Y. 2003) (emphasis added, citation omitted); *see*

6  *also Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*, No. 10-02175-

7  DDP, 2010 WL 4366849, at *4 (C.D. Cal. Sept. 23, 2010) ("Mead relies heavily on

8  [antitrust cases decided at the summary judgment or post-trial stages].  None of these

9  cases, however, dismissed antitrust claims under Rule 12(b)(6)."); *Evergreen*

10 *Partnering Group., Inc. v. Pactiv Corp.*, 720 F.3d 33, 44 (1st Cir. 2013) ("The slow

11 influx of unreasonably high pleading requirements at the earliest stages of antitrust

12 litigation has in part resulted from citations to case law evaluating antitrust claims at

13 the summary judgment and post-trial stages.").  The court in *Reading I* was careful to

14 note that while it "may prove true after discovery or trial that these clearances were

15 in fact completely justified," the plaintiff's allegations could survive a motion to

16 dismiss.  *Reading I*, 317 F. Supp. 2d at 322.  Regal cites to *Reading II* on summary

17 judgment while ignoring the applicable decision on a motion to dismiss (except for

18 an unrelated portion it believes supports another one of its arguments).  Finally,

19 Starlight also alleges that the film industry has evolved, and what was once the

20 primary justification for clearances in the past—exclusivity in exchange for an

21 exhibitor paying for extra promotion or advertising in the market—rarely, if ever,

22 applies anymore.[2]  (Compl. ¶ 15.)  In a nutshell, under federal law, the question of

23

24 _____

25    [2] This allegation, which must be accepted as true, also defeats the rationale
   some courts have used  in the past to justify clearances.  For example, if Regal
26 obtained clearances in exchange for increased spending to advertise a film, Starlight
   might unfairly "free ride" off of Regal's expenditure by reaping increased business
   through this advertising.  *See, e.g.*, *Theee Movies*, 828 F.2d at 1399.  Clearances
27 were used in the past to combat this "free riding" and encourage spending to increase
   interbrand competition—even if the clearances might reduce intrabrand competition.
28 *Id.*  But because such expenditures are now rare, intrabrand competition is now
   reduced without the offsetting benefit of increased interbrand competition.

1   whether clearances or any other restraint of trade are "unreasonable" is not ripe until

2   at least summary judgment.

3          California law—again, the applicable substantive law—concerning the stage

4   of litigation where an agreement may be found "unreasonable" under the Cartwright

5   Act is even more stringent.  The California Supreme Court has held that "[w]ether a

6   restraint of trade is reasonable is a *question of fact* to be determined *at trial*."

7   *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 855 (1971) (emphasis

8   added); *Redwood Theatres*, 200 Cal. App. 3d at 713 (same);  *Kolling v. Dow Jones &*

9   *Co.*, 137 Cal. App. 3d 709, 727 (1982) (same); *accord Fisherman's Wharf*, 114 Cal.

10  App. 4th at 335 ("The resulting factual inquiry [under the rule of reason] often makes

11  summary judgment inappropriate.").  In summary, Regal's position that clearances

12  are categorically "reasonable" under the rule of reason absent "extraordinary

13  circumstances," such that this Court can dispose of Starlight's claim on a motion to

14  dismiss, finds little support in federal law and virtually none in California law.

15                **b.**     **Starlight has alleged a relevant product and geographic**

16                           **market**

17         Regal's next line of attack targets Starlight's alleged relevant market.

18  "Antitrust law requires allegation of both a product market and a geographic

19  market."  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 n.4 (9th

20  Cir. 2008).  Starlight alleges that the relevant product market in this case is the

21  licensing of first-run films (Compl. ¶ 21), and the relevant geographic market is

22  Corona, California, (*id.* ¶ 20).  Regal challenges only Starlight's allegation that

23  Corona is the relevant geographic market; it does not challenge that the product

24  market is sufficiently pleaded.  Regal's challenge to Starlight's alleged geographic

25  market is ill founded.

26         Under California law, "[t]he definition of a relevant market or line of

27  commerce presents a difficult question of law and fact, which cannot properly be

28  resolved on the basis of [a] limited record."  *Corwin*, 4 Cal. 3d at 855; *cf. Exxon*, 51

13

1   Cal. App. 4th at 1682-83 (acknowledging that "relevant market may be a question of
2   fact" but deciding it as a matter of law after summary judgment where the "record
3   before us is anything but limited" and the "undisputed facts leave no room for a
4   reasonable difference of opinion").  Federal law is in accord: "There is no
5   requirement that [relevant market or market power] be pled with specificity. . . . An
6   antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent
7   from the face of the complaint that the alleged market suffers a fatal legal defect.
8   And since the validity of the 'relevant market' is typically a factual element rather
9   than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6)
10  subject to factual testing by summary judgment or trial."  *Newcal*, 513 F.3d at 1044-
11  45 (citation omitted); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d
12  435, 442 (4th Cir. 2011) ("[D]etermining the relevant geographic market is a fact-
13  intensive exercise centered on the commercial realities of the market and
14  competition.").

15       It would be improper to dismiss Starlight's claim where there is no factual
16  record simply based on Regal's assertion that Corona is not a relevant geographic
17  market.  Making this determination would require the Court to factually determine
18  that consumers in Corona can, and regularly do, turn to theaters in other cities to see
19  first-run movies.  This is, of course, theoretically possible, but it is also possible that
20  an individual in Corona could hop on a plane and fly to New York to see a movie.
21  Surely, Regal would not contend Corona and New York are in the same market.  The
22  upshot is that there are far too many factual questions to decide this issue on a
23  motion to dismiss.  For example, do Corona consumers regularly leave Corona to see
24  first-run movies?  How long does it take, and how cumbersome is it—accounting for
25  things like traffic and convenience—for Corona consumers to get to theaters that
26  exhibit first-run films in neighboring cities?  Do theaters in surrounding areas have
27  the same customer base as the theaters in Corona?  Does Regal internally treat the
28  Corona area as a market separate from geographically proximate cities?  Do

1  distributors treat Corona as a unique market for purposes of film licensing?  Do

2  theaters in neighboring cities market to Corona residents?  There are just a few of the

3  unresolved considerations.  *See E.I. du Pont*, 637 F.3d at 442-43 (listing some factual

4  questions involved in the geographic market inquiry).  At this stage, there is nothing

5  at all implausible about Corona serving as a geographic market, and long ago, the

6  Supreme Court held that a geographic market "may be as small as a single

7  metropolitan area."  *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 337 (1962).

8        The cases Regal cites do not command otherwise.  For example, in *Big Bear

9  Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999), the Ninth

10  Circuit sensibly found that Big Bear Valley was not an effective area of competition.

11  That was because common sense dictates that unlike seeing movies, most people are

12  willing to travel to go skiing.  In the face of that common-sense fact, the plaintiff was

13  required to, but did not, explain why the market should be limited to Big Bear

14  Valley.  *Id.*  Similarly, in *Tanaka v. University of Southern California*, 252 F.3d

15  1059, 1063 (9th Cir. 2001), the Ninth Circuit rejected a geographic market of Los

16  Angeles because the complaint itself "strongly suggest[ed] that the relevant market

17  [was] national in scope."  Starlight's complaint, by contrast, contains no such

18  contradictory allegations.  Moreover, the plaintiff in *Tanaka* alleged that the relevant

19  market was Los Angeles because "she wanted to be close to her family."  *Id.*  This

20  allegation, of course, is just a personal preference and does not necessarily

21  correspond with the "commercial realities of the industry," which is what a relevant

22  geographic market must be modeled on.  *Brown Shoe*, 370 U.S. at 336.  Finally,

23  Regal oddly and incorrectly cites *RealPage, Inc. v. Yardi Systems, Inc.*, 852 F. Supp.

24  2d 1215 (C.D. Cal. 2012) as dismissing a Cartwright Act claim for failing to allege a

25  relevant market.  (Dkt. 21 at 12.)  Regal has misread this case.  In *RealPage*, Judge

26  Wright *denied* the defendant's motion to dismiss the Sherman and Cartwright Act

27  claims, writing, "While Yardi vigorously contests RealPage's exclusion of self-

28  hosting from the relevant market in this case, Yardi's protestations turn on issues of

1   fact inappropriate for resolution at this stage of the litigation.  Accordingly, the Court

2   finds that RealPage's definition of the relevant product and geographic markets in

3   this case withstand scrutiny for the purposes of Rule 12(b)(6)."  852 F. Supp. 2d at

4   1225.  So too here.  Absent some patently implausible relevant market or Starlight

5   pleading allegations that blatantly contradict its asserted relevant market, the Court

6   should not decide as a matter of law that Corona is an unsustainable relevant

7   geographic market.

8           c.      **Starlight has alleged that Regal's network of clearances**

9                   **harm competition**

10          Continuing to analyze this case under the rule of reason, Starlight must allege

11  a harm to competition.  *Marin County Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d

12  920, 934-35 (1976).  Put another way, Starlight must ultimately prove that Regal's

13  network of clearances had an anticompetitive effect in the market for first-run films

14  in Corona to prevail.  *Exxon*, 51 Cal. App. 4th at 1680-81.  Regal contends in its

15  Motion that Starlight has failed to allege such a competitive harm.  Regal is

16  incorrect.

17          The very first paragraph of Starlight's complaint states that Regal's "illegal

18  conduct has deprived the public of choice with respect to the theaters in which they

19  are able to see films [and] has severely damaged competition in licensing of films."

20  (Compl. ¶ 1.)  The complaint describes Regal's conduct in detail (Compl. ¶¶ 22-25),

21  and alleges that this conduct was done with predatory intent to prevent Starlight from

22  competing in Corona, (Compl. ¶ 26.)  These allegations suffice to state a harm to

23  competition under case law from this district.  In *Blue Sky*, Judge Pregerson wrote,

24  "The FAC alleges that Mead entered into an exclusive dealing contract with the

25  intent and effect of excluding all rivals from certain office superstores. [Citation].

26  The FAC further alleges that Mead uses a bundling pricing scheme to sell dated

27  goods below cost.  [Citation].  These allegations of anticompetitive conduct are not

28  bare legal conclusions, and are sufficient to withstand a motion for dismissal." *Blue*

*Sky*, 2010 WL 4366849, at *4.  Starlight's allegations in the complaint are no less detailed than those in *Blue Sky*.  To require detailed allegations of harm to competition at this juncture would be unrealistic.  California courts have written that the rule of reason "requires [a] complicated and prolonged economic investigation." *People v. Santa Clara Val. Bowling Proprietors' Ass'n*, 238 Cal. App. 2d 225, 234 (1965); *Marin County*, 16 Cal. 3d at 930-31 (noting that a rule of reason necessitates an "elaborate inquiry"); *see also E. Food Servs. Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 5 (1st Cir. 2004), (noting that establishing anticompetitive effects under the rule of reason "is usually a demanding and fact-intensive process").  Such "complicated" and "elaborate" detail does not belong in a complaint.

Under Regal's argument, the only one harmed by Starlight's foreclosure from first-run movies is Starlight itself, and this is no cause for concern to competition. (Dkt. 21 at 14-15.)  This argument is squarely at odds with bedrock principles of California antitrust law:

> The preservation of competition, while indirectly aiding society by producing lower prices and higher quality goods and services, directly aids the scrupulous trader by insuring him a fair opportunity to compete on the market.  An anticompetitive practice is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy.

*Marin County*, 16 Cal. 3d at 935.  Indeed, the "fundamental purpose" of the Cartwright Act is "to protect competition at the retail level."  *Exxon*, 51 Cal. App. 4th at 1684.  Here, "one does not need an advanced degree in economics to predict" what harms will flow from the virtual elimination of retail competition in Corona by locking up the entire market, or close to the entire market, for first-run films with

1   clearances. *Marin County*, 16 Cal. 3d at 936. Conduct that "prevents [a competitor]

2   from competing" results in "less competition . . . which means higher prices and

3   fewer choices for consumers." *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l*

4   *Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010); *Gulf States Reorganization Group, Inc.*

5   *v. Nucor Corp.*, 466 F.3d 961, 967 (11th Cir. 2006) (noting that the elimination of a

6   competitor deprives "consumers in the relevant market the benefit of the pressure to

7   lower prices"). So, the harm of eliminating retail competition for first-run films in

8   Corona is more than just consumers having to go to a second-choice theater, as Regal

9   contends (Dkt. 21 at 16)—it strikes at the very heart of why the antitrust laws exist,

10  preserving competition.[3]

11  **B.    Starlight alleges a violation of California's Unfair Competition Law**

12          Starlight's second claim for relief is for violations of California's UCL.

13  Section 17200 of the California Business and Professions Code defines unfair

14  competition to include any "unlawful, unfair or fraudulent business act or practice."

15  Cal. Bus & Prof. Code § 17200. The UCL "is a chameleon" that "borrows"

16  violations from other laws and makes them "independently actionable." *Aryeh v.*

17  *Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1196 (2013) Starlight's UCL claim

18  derives from the same facts as its Cartwright Act claim.

19          Starlight's complaint alleges a UCL violation under both the "unlawful" and

20  "unfair" prongs. (Compl. ¶ 35). Yet, Regal asserts that Starlight, as a matter of law,

21  cannot state a UCL claim separate from its Cartwright Act claim. (Dkt. 21 at 16-17.)

22  This assertion is incorrect. The California Supreme Court has expressly held that a

23  competitor can file an equitable claim for unfair competition under the "unfair

24  prong" of the UCL if the conduct at issue threatens the underlying "policy" or

25

26  ─────────────────

27  [3] It is also worth noting that under California law, foreclosing a mere 20
    percent of the market with exclusive-dealing contracts is sufficient to establish
    substantial foreclosure for purposes of surviving a motion for summary judgment.

28  *Fisherman's Wharf*, 114 Cal. App. 4th at 339. The foreclosure here, by contrast, is
    close to 100 percent, and this is a motion to dismiss. (Compl. ¶ 22.)

18

1  "spirit" of the antitrust laws.  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20

2  Cal. 4th 163, 187 (1999) ("[T]he word 'unfair' . . . means conduct that threatens an

3  incipient violation of an antitrust law, or violates the policy or spirit of one of those

4  laws because its effects are comparable to or the same as a violation of the law, or

5  otherwise significantly threatens or harms competition.")  In so holding, the

6  California Supreme Court made clear that a claim under the "unfair" prong is

7  separate from a derivative claim under the "unlawful" prong of the UCL: "[T]he

8  [UCL] does more than just borrow.  The statutory language referring to 'any

9  unlawful, unfair *or* fraudulent' practice makes clear that a practice may be deemed

10  unfair even if not specifically proscribed by some other law." *Id.* at 180.  If the Court

11  finds that the conduct Starlight alleges does not establish a Cartwright Act violation,

12  it becomes a question of fact whether that conduct rises to an "unfair" practice within

13  the UCL's parameters.  *See Countrywide Fin. Corp. v. Bundy*, 187 Cal. App. 4th

14  234, 257 (2010) (noting that whether a practice is "unfair" is "a question of fact

15  which depends on the circumstances of each case").  Accordingly, Regal's motion to

16  dismiss Plaintiff's UCL claim should be denied.

17  **C.     Starlight alleges a claim for intentional interference with**

18  **prospective economic advantage**

19  Starlight's final claim is for the state-law tort of intentional interference with

20  prospective economic advantage.  The elements of this tort are (1) an economic

21  relationship between the plaintiff and a third party; (2) the defendant knew of this

22  relationship; (3) intentional acts by the defendant intended to disrupt the relationship;

23  (4) the relationship was disrupted; and (5) economic harm that was proximately

24  caused by the defendant's acts.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.

25  4th 1134, 1153 (2003).  In addition, the tortious act must be "wrongful by some legal

26  measure other than the fact of interference itself."  *Id.* (internal quotation marks

27  omitted).  Regal's first challenge to this claim is that Starlight has not pleaded any

28  "wrongful conduct."  (Dkt. 21 at 17-18.)  That challenge should fail because

1  Starlight alleges that Regal's conduct is not competitively justified and was intended

2  to injure Starlight and its business through obtaining an unlawful competitive

3  advantage.  (Compl. ¶¶ 40-41.)  And more importantly, because Starlight has pleaded

4  a valid Cartwright Act claim, which constitutes an "independent wrong," this

5  argument is meritless.  *Blue Sky*, 2010 WL 4366849, at *6 ("Because the court

6  denies the motion to dismiss with respect to several of Blue Sky's antitrust claims,

7  the court also denies the motion with respect to the tortious interference claim.").

8  　　　Regal's second challenge is that Starlight has failed to allege that it would

9  have obtained an economic advantage but for Regal's interference because it has not

10  alleged a "specific business relationship" that was disrupted.  (Dkt. 21 at 18.)  This

11  argument also falls flat because Starlight alleges several relationships that were

12  disrupted.  Starlight alleges that its relationships with its patrons were disrupted

13  because of Regal's anticompetitive conduct.  (Compl. ¶¶ 38, 40-41.)  Starlight cannot

14  be expected to provide a list of its customers in its complaint.  Starlight also alleges,

15  contrary to Regal's contention, that its relationship with film distributors was

16  disrupted because of Regal's anticompetitive conduct.  (*Id.* ¶¶ 39-41.)  There are

17  only a few film distributors, and Starlight alleges that Regal obtains the clearances

18  for the vast majority of all first-run films in Corona.  Given how concentrated the

19  distribution market is, this allegation should suffice.

20  　　**D.　　In the event that the Court finds Starlight's complaint deficient,**

21  　　　　　**Starlight should be granted leave to amend its complaint**

22  　　　The Federal Rules provide that "The court should freely give leave [to amend]

23  when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In this Circuit, the policy

24  favoring amendment of complaints is to applied with "extreme liberality" and

25  dismissals with prejudice should occur in only "extraordinary" cases.  *Morongo*

26  *Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1987); *see also DCD*

27  *Programs, Ltd. v. Leighton*, 833 F.2d 183, 190 (9th Cir. 1987) (reversing district

28  court for denying leave to file a *fourth* amended complaint).  Here, Starlight has filed

only a single complaint, and it filed that complaint in state court, which has different pleading rules than the federal courts.  For this reason, if the Court deems Starlight's complaint to be deficient in any manner, Starlight respectfully requests leave to file an amended complaint.

## IV.   CONCLUSION

For the reasons above, Regal's Motion to Dismiss should be denied. Alternatively, if this Court agrees with any of Regal's arguments and finds Starlight's complaint deficient, Starlight respectfully requests leave of the Court to file an amended complaint.

Dated:  September 17, 2014          Respectfully submitted,

BLECHER COLLINS PEPPERMAN & JOYE, P.C.


By:   _____/s/ Maxwell M. Blecher_____
                Maxwell M. Blecher
        Attorney for Plaintiff Starlight Cinemas

60348.3